STATE OF NORTH CAROLINA v. STEVEN RANDALL HARRIS

No. 21A92

(Filed 7 May 1993)

## 1. Evidence and Witnesses § 732 (NCI4th)— murder—statement by defendant following invocation of right to remain silent— not prejudicial

There was no prejudicial error in a murder prosecution where defendant made an oral statement, officers told defendant that he was not telling the truth, defendant said that he had nothing more to say, an SBI agent assured defendant that he wanted defendant's side of the story and was willing to record it, defendant gave the agent a detailed statement, the agent reduced the statement to writing and read it back to defendant sentence by sentence, and defendant signed and dated each individual page of the statement. Assuming that defendant invoked his right to silence before giving his second statement, the State carried its burden of showing that any error was harmless beyond a reasonable doubt given the incriminating nature of defendant's initial oral statement and other testimony at trial.

**Am Jur 2d, Appeal and Error §§ 797-801, 803.**

## 2. Criminal Law § 491 (NCI4th)— murder—jury view of house— jury permitted to roam house—no error

There was no error in a murder prosecution where the murder was committed inside a house and the jury was permitted to roam freely through the house during a jury view rather than being held together as a body. Although defendant contends that his right to be present at all phases of his trial was violated, there is no requirement that a defendant in a capital case be in the presence of all members of the jury, assembled as a single body, throughout such a jury view. Furthermore, defendant's right to a unanimous jury verdict was not violated. There is no authority to support the contention that the Constitution of North Carolina requires that jurors always view precisely the same evidence at the same time. N.C.G.S. § 15A-1229(a).

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment entered by Hudson, J., in the Superior Court, Alamance County, on 17 May 1991. Heard in the Supreme Court on 15 January 1993.

*Michael F. Easley, Attorney General, by Dennis P. Myers, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for the defendant-appellant Harris.*

MITCHELL, Justice.

The defendant was indicted on counts of first-degree murder, conspiracy to commit murder, and robbery with a dangerous weapon. The jury convicted the defendant on all counts. At a separate capital sentencing proceeding, pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of life imprisonment. The trial court entered judgment accordingly. The defendant appealed to this Court as a matter of right from the judgment imposing a life sentence for first-degree murder. This Court allowed the defendant's motion to bypass the Court of Appeals with regard to his appeal of the other related convictions.

The State's evidence introduced at trial tended to show, *inter alia*, the following. On 19 March 1990, Ronald Satterfield, sales administrator at MAP Enterprises in Burlington, found Roy Mahaley's body in the trunk of Roy's car. Satterfield testified that on the morning of 19 March 1990, he was concerned because Roy was not yet in the office and because Roy had failed to keep an appointment with another MAP Enterprises employee on the previous day. After hearing that Roy's car was parked in its normal place in the company parking lot, Satterfield walked over to the car and noticed that the keys were in the ignition. Satterfield then reached into the car, took the keys out of the ignition and opened the trunk, where he found Roy's body.

David Hedgecock, a special agent with the State Bureau of Investigation, testified that he went to MAP Enterprises on 19 March 1990 and participated with other officers in the investigation of Mahaley's death. During the investigation, Agent Hedgecock interviewed Ronald Satterfield. Satterfield gave Agent Hedgecock information concerning Marylin Mahaley's relationship with Roy, who was her husband, and with Steven Randall Harris, the defend-

ant. After speaking with Satterfield, Agent Hedgecock and Detective Kevin Crowder interviewed Marylin Mahaley and Eric Taylor. As a result of these interviews, the officers arrested the defendant at a Burlington motel.

Following his arrest at the motel, the defendant was transported to the Burlington Police Department where he was interviewed by Agent Hedgecock and Detective Crowder. After being informed of and waiving his constitutional rights, the defendant made an oral statement and then signed a written statement containing the following information. On Friday, 16 March 1990, Mahaley visited the defendant's room at the Knights Inn in Burlington. Roy was carrying a stick, and he hit the defendant on the arm. The defendant took the stick away from him and hit him with it several times. After the two men stopped fighting, they talked for approximately thirty minutes about resolving their differences. Roy left the defendant's room at approximately 11:30 p.m.

On the following day at approximately 3:00 p.m., the defendant spoke with Roy on the telephone about getting together to talk about their problems, but they did not set a specific time or date. At some point during that afternoon, Eric Taylor visited the defendant's room, where the two men drank vodka and played video games. At approximately 9:30 p.m., Marylin Mahaley called the defendant and told him that Roy was asleep. During their conversation, the defendant and Marylin both stated that if Roy was not cooperative, maybe they should kill him. The defendant then told Marylin that he was coming over to her home in fifteen minutes.

Taylor and the defendant drove to the Mahaley home and went to the back of the house. Marylin opened the door and told them that Roy was in the den. The defendant told Marylin to go into the bedroom and to stay there until he came to get her.

The defendant knelt beside Roy and saw the butt of a gun sticking out from underneath the couch. Roy opened his eyes and rolled toward the gun. The defendant grabbed a baby blanket from the floor and began to choke Roy. After the defendant choked Roy for a couple of minutes, Taylor took the blanket and began to choke Roy. At this point, the defendant went to the bedroom and asked Marylin if she had a piece of wire or rope. Marylin told the defendant that there was wire in the basement, so the defendant went to the basement and found a long piece of cloth near the furnace. The defendant went back upstairs and put the

piece of cloth around Roy's neck and laid the blanket aside. Taylor and the defendant both choked Roy with the piece of cloth. After choking Roy for approximately twenty minutes, the defendant told Marylin that Roy was dead.

Marylin told Taylor and the defendant to dress Roy in his work clothes and to take his body to MAP Enterprises. After dressing Roy's body in his work clothes, the two men put the body into the trunk of Roy's car. Before the two men left for MAP Enterprises, Marylin took money from her husband's wallet and gave it to Taylor so that he could pay a ticket. At approximately 2:30 a.m., the two men drove Roy's car to MAP Enterprises and parked it in his usual parking space.

At the defendant's trial, Eric Taylor, who had entered into a plea arrangement with the prosecution, testified that he met the defendant while they were working at the Hillsborough Inn-keeper Motel in the fall of 1989. Taylor occasionally would go to the defendant's hotel room to drink, smoke marijuana and play video games. In late February 1990, the defendant wrote a check payable to Taylor in the amount of $950 on the account of Roy Mahaley, and Taylor cashed this check. During this same period, the defendant started talking about harming Roy. The defendant asked Taylor to provide him with an alibi. During the week of the killing, the defendant told Taylor that he wanted to kill Roy because Roy was investigating the forged check.

On the night of the killing, Taylor called the defendant. The defendant told Taylor that he and Roy Mahaley had fought and that he had injured Roy severely. The defendant said that he would have to kill Roy that night. Taylor went to the defendant's room at approximately 8:00 p.m. At approximately 8:30 p.m., the defendant called Marylin and told her to put out Roy's clothes so that he could dress Roy's body after killing him. The defendant also told Marylin to call him back when Roy was asleep. At approximately 10:30 p.m., Marylin Mahaley called the defendant and told him that Roy was asleep. The defendant told Marylin that he and Taylor would be over soon.

As the defendant and Taylor approached the Mahaley carport, they observed Roy Mahaley lying on the floor in the den. At that point, Marylin Mahaley opened the door for the two men, and the defendant told her to go back into the bedroom and wait. The defendant walked over to Roy and began to strangle him

with a necktie. While the defendant was choking Roy, the necktie broke, so the defendant used a blanket and a cord to finish the task. Taylor also choked Roy with the blanket and the cord. After killing Roy, the defendant dressed the body in work clothes and put it in the trunk of Roy's car. After placing Roy's body in the trunk, the defendant took money from Roy's wallet and gave $150 to Taylor and the rest to Marylin.

The defendant wanted to leave Roy's car in a bad neighborhood so that the police would suspect robbery as the motive for Roy's death. However, Marylin recommended that the car be left at MAP Enterprises because it would raise less suspicion. In response to Marylin's recommendation, the defendant and Taylor left the car at MAP Enterprises and returned to the Mahaley home. Upon returning to the Mahaley home, Taylor noted that Marylin seemed relieved. As the defendant and Taylor prepared to leave, Marylin thanked Taylor for helping them and gave the defendant a kiss.

The defendant's evidence introduced at trial tended to show, *inter alia*, the following. The defendant testified that he met Marylin Mahaley at Oakleigh Rehabilitation Center and that they became friends. However, they were both discharged from the program because they tended to pair off and separate themselves from the group activities. Following their discharge from Oakleigh Rehabilitation Center, the defendant and Marylin began to have a relationship, despite the fact that Marylin was married to Roy.

The defendant became friends with Eric Taylor during October or November of 1989. The defendant and Taylor both worked at the Hillsborough Innkeeper as desk clerks. The two men drank beer, smoked marijuana and played video games together. The defendant also talked to Taylor about his relationship with Marylin. At one point, Taylor told the defendant that killing Roy Mahaley would solve their problems. The defendant admitted that he had taken one of Roy's checks. However, the defendant testified that Taylor signed the check and cashed it in order to pay some debts. A few days prior to the killing, the defendant told Taylor that Roy had reported the stolen check to the police.

On Friday, 16 March 1990, Roy visited the defendant's motel room and attacked him with a stick. The defendant took the stick from Roy and used it to beat him. Roy was bleeding badly, so the two men stopped fighting. After the fight, the defendant got a wet cloth for Roy's wound, and the two men talked. The defendant

apologized for opening the cut on Roy's head, and Roy apologized for starting the fight. The two men decided that it was critical that they discuss a peaceful resolution, so they agreed to talk at the Mahaley home on the following day after the Mahaleys' daughter, Samantha, was asleep.

The defendant testified that on Saturday, 17 March 1990, he called Roy and confirmed their plan to meet that evening. At some point during the day, Taylor visited the defendant's motel room, and the defendant purchased liquor for Taylor. Taylor left the defendant's motel room and returned after dinner. The two men smoked marijuana and had drinks. At approximately 10:30 p.m., Marylin called and told the defendant that Samantha was asleep and that Roy was watching television in the den. The defendant told Marylin that he would be over in a few minutes. The defendant testified that Taylor had asked him to talk to Roy about the check, but the defendant told Taylor that he should talk to Roy himself in order to avoid prosecution.

Upon arriving at the Mahaley home, Taylor and the defendant walked to the carport door, and Marylin told them to come in. Marylin appeared to be nervous, so the defendant tried to reassure her that everything was going to be all right. Marylin told the defendant that Roy had loaded his gun and that Roy had been drinking. The defendant told Marylin to go into the bedroom and stay with Samantha until he had had an opportunity to speak with Roy.

The defendant testified that when he and Taylor walked into the den, Roy reached for a gun which was underneath the couch. The defendant threw a blanket over Roy's head, and Roy hit his head on a table and was knocked unconscious. The defendant took the gun into the kitchen and put it on a counter. He then told Taylor to keep an eye on Roy. The defendant went into the bedroom and asked Marylin if she had some rope so that he could tie Roy's hands. Marylin said that there was probably some rope in the basement. The defendant found a piece of cord in the basement and went back to Marylin's bedroom.

The defendant testified that he heard loud voices, so he went into the den and found Taylor strangling Roy with the blanket. The defendant took the blanket from Roy's neck and checked his pulse; Roy was still alive. Taylor told the defendant that Roy had regained consciousness and started fighting with him, so he had

STATE v. HARRIS

[333 N.C. 543 (1993)]

choked Roy until he passed out. The defendant again went into the bedroom to talk to Marylin. When he returned to the den, Taylor was choking Roy with the cord that the defendant had brought from the basement. The defendant tried to remove the cord, but he inadvertently tightened it on Roy's neck. The defendant checked Roy's pulse and determined that he was dead. The defendant then went into the bedroom and told Marylin that Roy was dead.

The defendant testified that he had been afraid to call the police because he felt that his relationship with Marylin would make the two of them natural suspects. After he talked to Marylin, they decided that it would be less suspicious to leave Roy's car at MAP Enterprises. Taylor and the defendant dressed Roy's body in work clothes and put it in the trunk of his car. Marylin picked up Roy's wallet, gave Taylor $150 and kept the rest for herself. The defendant drove Roy's car to the Knight's Inn and wiped the fingerprints from the car. He then drove the car to MAP Enterprises and left it parked in Roy's normal space.

John Kramer, a friend of the defendant, testified as follows. Kramer lived in Baltimore, Maryland, and had known the defendant since the defendant was twelve-years-old. The defendant once worked for Kramer, and they had been good friends over the years. Kramer had never met Eric Taylor, but Taylor called him one day and told him that the defendant needed $350 in order to get out of jail. Kramer testified that Taylor said that he did not like Roy Mahaley and would kill Roy if he thought that he could do so without being caught. At some point after the killing, the defendant called Kramer and told him that "Eric killed Roy."

Other evidence introduced at trial is discussed at other points in this opinion, where pertinent to the issues raised by the defendant.

[1] By his first assignment of error, the defendant contends that his written statement was obtained in violation of constitutional principles explained in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), because the officers continued to interrogate him after he invoked his right to remain silent. In *Miranda*, the Court stated that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 474, 16 L. Ed. 2d at 723.

Following his arrest, the defendant in the present case was taken to the Burlington Police Department. After Detective Kevin Crowder informed the defendant of his constitutional rights, the defendant waived these rights and gave an oral statement to Detective Crowder and Special Agent David Hedgecock. Agent Hedgecock testified that:

> Mr. Harris stated that he met Marylin Mahaley at the Oakleigh Drug Rehabilitation Center in Durham. He stated that during that period at Oakleigh he found out that Marylin was married and that she was unhappily married. He said that they later moved out. She moved out of the house — after they left the Oakleigh Center that she later moved out of the house from Roy and they moved away together somewhere up north. He stated that they later returned because Marylin missed her daughter. When they moved back he went to Hillsborough. He stated that the previous Monday he moved to the Knights Inn in Burlington, however. He said that sometime Friday night his phone rang. It was around eight thirty p.m. He stated that a man that was on the other end of the phone cursed him and then hung up the phone. He said that at ten o'clock that night that Roy Mahaley came to [his] door at the Knights Inn; that Roy had some type of billy club and threatened him with it, hit him in the arm with it; and that he took away the billy club or the stick and beat Roy with it. He stated that after the fight that he and Roy talked some. Roy said something about a fight that he and Marylin had had where he threw Marylin through the door, through a kitchen door. He stated that he and Roy then fought again at the motel.

> After that Mr. Harris stated that he told Roy that he wanted to talk to both of them, Roy and Marylin, at the same time, and Roy indicated something about maybe the next night.

> Mr. Harris stated that later that night after Roy left the Knights Inn that he took a taxi cab and went to the emergency room of one of the hospitals in Burlington, and while he was there he saw Marylin. He got a key to the trunk of her car from Marylin, and he said something about a license plate that Roy had taken off [of] Marylin's car that he got out of Roy's and put back in the trunk of Marylin's car. Then he went home — went back to the Knights Inn.

He stated that the next day, which was Saturday, because he had told Roy that he would call him about them getting together to talk, that he called Roy or called the Mahaley residence about three o'clock p.m., talked to Roy. Roy agreed that they all needed to meet and talk it out, so he decided to go over to the house. He stated that sometime later that night he did in fact go over there. When he got there Roy was laying on the floor beside the couch. He stated that Roy had a handgun, and that he grabbed a blanket and wrapped it around Roy's neck and killed him. He said that he had a friend that helped him put Roy in the trunk — or that helped carry Roy out and put him in the trunk of his car.

He then said that — he indicated that the night he had fought with Roy at the Knights Inn that Roy had told him then that he had a gun with him that night. He hadn't said that earlier, but he interjected that at this point.

He also — at this point [noted that] the friend that had helped him carry Roy out to the trunk was identified as being Eric Taylor. He then said that he panicked when he saw the gun that Roy had. He said he drove over to MAP Enterprises afterwards after Roy was in the trunk. He stated that — then he backed up, as we were pressing him for a little bit of detail here. He said that he picked up the gun that Roy had and he emptied it. He described it as being a black revolver, about a .38 caliber. He said that Marylin wiped off the gun and put it on top of a cabinet, and put some bullets that were in the gun in a kitchen drawer.

He then said that Eric disposed of Roy's wallet, a xerox copy of a bad check that had been written on Roy's account in Eric's name. That was put in one bag. There was another bag that contained gauze bandage, some string from the basement, which at this point he indicated some string of some type had been used in the killing also. That was placed in a bag, also a couple of socks from the floor that had some blood on them. All these were put in another bag, and both of these bags were put in the car and disposed of subsequently.

At this point one of the officers, myself or Detective Crowder, asked Mr. Harris how much money he had on him or with him. He emptied his pockets. He had a little over

a hundred dollars. He had a hundred dollar bill, he had two fives, several ones.

Mr. Harris admitted, with reference to the check, that he had stolen that check from the Mahaley residence once when Roy was out of town and he was staying with Marylin at her house. He said he took it because it contained Roy's driver's license number and some other information he could use to mess with Roy. He said he was angry with Roy because he felt that Roy was responsible for his having been arrested for not paying some type of—some local motel bill of some type.

The trial court found as a fact that the defendant made his statement to the officers precisely as testified to by Agent Hedgecock.

Based on substantial evidence the trial court found that when the defendant concluded his oral statement, the two officers told him that he was not telling the truth. The defendant became angry and said "f--- you, if you don't believe me. That's the truth. If you don't believe me, I have nothing else to say." Agent Hedgecock then assured the defendant that he wanted his side of the story and "was perfectly willing to record it." The defendant agreed to give Agent Hedgecock a more detailed written statement. The defendant then gave a detailed statement to Agent Hedgecock, which Hedgecock reduced to writing and read back to the defendant sentence by sentence. Thereafter, the defendant signed and dated each individual page of the statement.

The defendant does not argue that the officers failed to fully advise him of his constitutional rights before he gave either his initial oral statement or the second statement which he signed after it was reduced to writing. Instead, he contends that when he said, "if you don't believe me, I have nothing else to say," he invoked his right to remain silent. He argues that the statement he made in response to questions asked by the officers after that invocation of his right to remain silent was admitted into evidence in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States.

We assume *arguendo* that the defendant invoked his right to silence before giving his second statement which was reduced to writing and that, in light of the continued questioning by the officers immediately after his assertion of that right, the defendant did not knowingly and intelligently waive his privilege against self-

incrimination as guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States. *See generally Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313 (1975). A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the State demonstrates that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705 (1967); N.C.G.S. § 15A-1443(b) (1988). The presence of overwhelming evidence of guilt, however, may render errors of constitutional dimension harmless beyond a reasonable doubt. *State v. Autry*, 321 N.C. 392, 364 S.E.2d 341 (1988). This is such a case.

In his initial oral statement, the defendant admitted that he went to the Mahaley home and that he "grabbed a blanket and wrapped it around Roy's neck and killed him." The defendant also stated that some type of cord had been used in the killing. The defendant further stated that Eric Taylor had been present and had assisted him in removing and concealing Roy's body. While the defendant's written statement included additional details about the crime, his initial oral statement described his killing of the victim in substantial detail. Given the incriminating nature of the defendant's initial oral statement, coupled with Eric Taylor's testimony at trial, we conclude that the State has carried its burden of showing that any error in the trial court's failure to suppress the defendant's written statement was harmless beyond a reasonable doubt. Accordingly, this assignment of error is without merit and is overruled.

[2] By his next assignment of error, the defendant contends that the trial court erred by granting the defendant's motion for a jury view of the Mahaley home. We assume *arguendo* that the defendant is entitled to raise this issue on appeal. *But see* N.C.G.S. § 15A-1443(c) (1988). Nevertheless, we conclude that the assignment is without merit.

The defendant does not contend that the trial court abused its discretion in granting his motion for a jury view or that the trial court failed to follow N.C.G.S. § 15A-1229, the statute governing jury views. Instead, the defendant contends that since members of the jury were permitted to roam freely about the Mahaley home and were not held together as a body to inspect the premises, his state constitutional rights to a unanimous jury verdict and to be present at all stages of his capital trial were violated.

In the present case, the defendant requested a jury view of the Mahaley home pursuant to N.C.G.S. § 15A-1229(a), which provides that

> [t]he trial judge in his discretion may permit a jury view. If a view is ordered, the judge must order the jury to be conducted to the place in question in the custody of an officer. The officer must be instructed to permit no person to communicate with the jury on any subject connected with the trial,except as provided in subsection (b), nor to do so himself, and to return the jurors to the courtroom without unnecessary delay or at a specified time. The judge, prosecutor, and counsel for the defendant must be present at the view by the jury. The defendant is entitled to be present at the view by the jury.

N.C.G.S. § 15A-1229(a) (1988). In granting the defendant's request for a jury view, the trial court followed the procedures mandated by this statute. The trial court ordered the sheriff's department to permit no person to communicate with the jurors and further instructed the officers in charge not to communicate with the jurors. The trial court, the prosecutors, defense counsel, and the defendant were all present at the jury view. Finally, the trial court ordered the sheriff's department to return the jurors to the courtroom without unnecessary delay.

The defendant contends that his right to be present at all stages of his capital trial was violated because the jurors were permitted to roam independently through the Mahaley home during the jury view of the home. Contrary to the defendant's contention, there is no requirement, constitutional or otherwise, that the defendant in a capital case be in the presence of all members of the jury, assembled as a single body, throughout such a jury view. Even in a capital case, the Constitution of North Carolina and N.C.G.S. § 15A-1229(a) require only that the defendant be present during a jury view. Cf. State v. Huff, 325 N.C. 1, 381 S.E.2d 635 (1989) (establishing that the right of a capital defendant to be present at all stages of his trial is guaranteed by Article I, section 23 of the Constitution of North Carolina, but holding that the harmless error standard applicable to errors under the Constitution of the United States must, nevertheless, be applied to violations of the right). In the instant case, the defendant was present during the jury view.

The defendant further contends in support of this assignment that his right to a unanimous jury verdict under Article I, section 24 of the Constitution of North Carolina was violated because all jurors may not have viewed the same parts of the house at the same time. We find no authority to support the defendant's contention that the Constitution of North Carolina requires that jurors always view precisely the same evidence at the same time. On the contrary, it is standard practice in this state for photographs to be passed to a jury for viewing in the courtroom, and in such situations, jurors usually do not view the same photograph at the same time. By analogy, individual jurors may be permitted to look at different parts of a house at any given time during a jury view of the house. The defendant has failed to show that he has suffered any prejudice. In the present case, the trial court strictly complied with the requirements of N.C.G.S. § 15A-1229(a). In doing so, the trial court did not violate the defendant's right to a unanimous jury verdict. This assignment of error is overruled.

For the foregoing reasons, we conclude that the defendant received a fair trial free of prejudicial error.

No error.